The defendant called a witness who swore that he was present when the note was passed to the agent, and that the defendant then told him that if he took it he must do so at his own risk. This statement was denied by the agent, who swore that no such conversation took place, and that the witness who deposed to it was not present when the note was passed to him. *Page 296 
The defendant then offered to prove that immediately before the transaction deposed to by the plaintiff's agent, he, the defendant, had offered the note to one Mitchell, and had refused to guarantee it unless Mitchell paid him a premium for the bill and his guarantee. Neither the plaintiff nor his agent was present at the time of the conversation. The presiding judge rejected the testimony.
A verdict being returned for the plaintiff, the defendant appealed.
A person who receives a bank bill takes upon himself the solvency of the bank, but he who pays or exchanges it guarantees the bill to be genuine. This is the general law of the land, subject to which the parties must be presumed to have acted if nothing passed between them at the time of the contract. But a witness was introduced in this case who testified on behalf of the defendant that the latter told plaintiff's agent at the time of the contract, the agent who made it, that if he took the bill he must do so at his own risk. On the other hand, the plaintiff's agent who made the contract testifies that no such conversation passed, and that he did not even see the witness who deposed to it, present at the time.
Evidence was then offered on the part of the defendant of a conversation of the defendant's respecting this bill, to wit, that of Mitchell, to whom he offered it; if he took it at par it would be at his own risk; if defendant guaranteed it he was to have a premium. This conversation is stated to have taken place in a storehouse immediately before the conversation given in evidence by the plaintiff's agent, and in the absence of the plaintiff and his agent. The record states this confusedly, and I have nearly transcribed it, but I understand it to have been that the defendant told Mitchell he would not guarantee it without a premium; that if he would not give a premium he (Mitchell) must take the bill at his own risk.
This evidence was rejected by the court, and the question now presented is, Was the evidence properly rejected or not? I am of opinion that it was properly rejected.
Without this evidence, and supposing the credibility of the two conflicting witnesses to be equal, which I must take for granted, the case stands upon the legal implication that the defendant guaranteed the bill and is liable to compensate the plaintiff, since it turned out to be a counterfeit. *Page 297 
It is a rule of morals as well as of legal construction (447) that a contract is to be carried into execution in that sense in which the promisor apprehended at the time the promisee received it. It is not the sense, says a writer of much observation, in which the promisor actually intended it that always governs the interpretation of an equivocal promise; because at that rate a man might excite expectations which he never meant, nor would be obliged to satisfy. Much less is it the sense in which the promisee actually received the promise; for according to that rule the promisor might be drawn into engagements which he never meant to undertake. It must therefore be the sense (for there is no other remaining) in which the promisor believed that the promisee accepted his promise. And this, says he, will not differ from the actual intention of the promisor, where the promise is given without collusion or reserve. Paley, 96.
The application of this rule of natural justice appears to me to be decisive of this question. For which interpretation did Hawkins apprehend that Anderson put upon the contract? Clearly, as nothing passed between them in explanation, discharging Hawkins from his guarantee and placing the risk on Anderson, Hawkins must have believed that Anderson expected to be indemnified in the event of the note proving to be a counterfeit. But if this evidence is admissible, the rule is inverted, and Anderson is bound, not as Hawkins thought he conceived himself to be, but as a secret intention of Hawkins, which Anderson had no means of exploring, designed he should be.
It is argued in support of the admissibility of the evidence that it is a fact connected with the case; that the jury may draw their own inference from it, and as the scales of evidence hang in equilibrio, the introduction of this fact will make one of them preponderate.
But this argument is met by a stubborn and most wise and salutary rule of law, that the acts and declarations of others are not admissible in evidence against any one, as (448) affording a presumption against him, in the way of admission or otherwise. A man's privity to the acts and declarations of another may authorize the inference of his assent, and operate as an admission against himself. But where he is utterly a stranger to them, no inference or presumption can justly be made against him, founded upon his own admission or conduct. Were this evidence admissible, Anderson would certainly be bound by the declaration and act of Hawkins, to which he was no wise privy, and to which if he had been privy *Page 298 
the presumption is he would not have made the contract in the manner he did. The only inference the jury could derive from the evidence is that Hawkins did not intend to guarantee the bill; but is it not contrary to the most obvious principles of justice that Anderson should be bound by the secret intentions of Hawkins, which intentions were contradicted by his conduct? The irrelevancy of the evidence is not the only objection to it, for that might do no other mischief than needlessly consume time, but its tendency is to impair the rights of Anderson by the res acta between Mitchell and Hawkins.
The argument that according to the ordinary motives of human conduct it is incredible that Hawkins should have passed the bill to Anderson with a guarantee, when he had a few minutes before demanded a premium for one, is answered in a manner satisfactory to my mind: that to establish such a principle of evidence would enable men knavishly disposed to create evidence for themselves by making an offer to one person different from a contract they would immediately afterwards make with another, and then adduce such evidence to destroy the contract actually made. In every view I have been able to take of the case I am compelled to believe that there ought not to be a new trial.
(449) HALL, J., concurred with the CHIEF JUSTICE.